**SIGNED this 9 day of August, 2017.**



_____
**James P. Smith
Chief United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 7 |
| | : | |
| JACOB CHRISTOPHER HILSMAN, | : | |
| | : | |
| Debtor | : | Case No. 15-31022-JPS |
| | : | |
| OMAN FAMILY TRUST by PHIL OMAN AND MARY J. OMAN, it's Trustees, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | Adversary Proceeding |
| | : | No. 16-3009 |
| JACOB CHRISTOPHER HILSMAN, | : | |
| | : | |
| Defendant | : | |

BEFORE

James P. Smith
United States Bankruptcy Judge

APPEARANCE:

    For Plaintiff:                Kirby R. Moore
                                  Kirby R. Moore, LLC
                                  961 Walnut Street
                                  Macon, Georgia 31201

    For Defendant:              Kevin J. Cowart
                                  The Cowart Law Firm, P.C.
                                  P. O. Box 897
                                  Madison, Georgia 30650

In this adversary proceeding, Oman Family Trust seeks to have a claim arising out of the construction of a house declared nondischargeable under 11 U.S.C. § 523(a)(2)(A). The case was tried on May 25, 2017. At the conclusion of the trial, the Court asked the parties to submit their concluding arguments in writing. The Court, having considered the testimony and exhibits introduced at trial, the arguments of counsel and the law, now publishes its findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FACTS

Oman Family Trust ("Trust"), the Plaintiff in this case, is a trust formed by Phil Oman ("Oman") and his wife, Mary J. Oman, to hold assets owned by them.

Pilot Builders, Inc. ("Pilot") was a corporation formed in 1998 by Jacob Christopher Hilsman (Debtor and Defendant herein, hereinafter "Hilsman") and Douglas Tomlin for the purpose of constructing houses around Lake Oconee in Central Georgia. In approximately 2010, Tomlin left the company and Hilsman became the sole officer, shareholder and director of the corporation.

Mr. and Mrs. Oman lived in Vermont. Oman was in the retail business. As he was approaching retirement, he planned to sell his business and move with Mrs. Oman to Lake Oconee.

A friend of Hilsman, whose house had been built by Pilot several years earlier, introduced Oman to Hilsman. They had discussions about building a house in the Harbor Club Subdivision at Lake Oconee. As a result of these discussions, the Trust and Pilot entered into a construction contract on March 19, 2014, for a house to be built at an estimated cost of $342,500. Exhibit "A" to the contract lists certain allowed prices for items

3

(such as windows, doors, carpets, fixtures, cabinets, countertops, etc.) to be included in the house, with the Trust being responsible for any amounts actually spent over the allowed prices. Exhibit "B" to the contract provides a draw schedule, with an initial down payment of $34,250, an initial draw of $17,125, eight draws of $34,947.45 and a final draw of $17,473.73.

Both Hilsman and Oman testified that the Trust house was being "piggybacked" with another, more expensive house Pilot was building in the same neighborhood. Hilsman explained that, by using the same subcontractors and scheduling them to work on both houses on the same day, he was able to reduce total construction costs to the Trust.

Paragraph 11 of the contract, which provides a place for a date by which Pilot would use its best efforts to complete the house, was left blank. There was no explanation for this at trial. However, Oman testified that Hilsman promised the house would be completed by February 2015.

Construction started in July 2014. Oman made the initial down payment and seven requested draws between March and December 2014. In addition, he made a payment of $26,452 on December 8, 2014, for amounts exceeding the allowances for the items listed in Exhibit "A" to the contract. He testified that when he made this payment in December, Hilsman again promised that the house would be completed by February 2015.

In January 2015, Hilsman called Oman and advised that, due to delays at the other house Pilot was building (and on which the Trust house was to be "piggybacked"), the house would not be ready in February 2015. Rather, Oman testified that Hilsman promised that the house would be finished in April 2015. However, the house was still not complete in April

4

2015.

At the end of April 2015, Oman came to Georgia and had a meeting with Hilsman and Pilot's employees. They developed a list of everything that needed to be done to complete the house. Oman testified that Hilsman agreed that the house would be completed by June 15, 2015.

Oman testified that in mid-May 2015, Hilsman called him and, for the first time, revealed that Pilot was having financial problems. He testified that Hilsman asked for, and received, the final draw and again promised the house would be completed by June 15, 2015.

Oman testified that in late May 2015, Hilsman called him and told him he was not going to be able to complete the house. The Trust completed the house through another contractor. Hilsman filed his Chapter 7 petition on September 21, 2015. Pilot was thereafter dissolved on October 27, 2015.

The parties stipulated that the Trust paid Pilot a total of $420,327 over a period of fourteen months and that approximately $256,000 was applied to labor and materials for the house. The parties stipulated that $164,000 represented the amount paid, but not applied to the cost of the house. Accordingly, this is the amount the Trust sought to have declared nondischargeable under section 523(a)(2)(A).[1]

## CONCLUSIONS OF LAW

1. <u>False Representations</u>

---

[1] The difference between $420,327 and $256,000 is $164,327. The reason why the parties stipulated to the $164,000, instead of $164,327, was not explained.

11 U.S.C. § 523 provides, in pertinent part:

> (a) A discharge under section 727...of this title does not discharge an individual debtor from any debt-
> ...
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
> (A) false pretense, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...

The plaintiff has the burden of proving by a preponderance of the evidence that the claim is nondischargeable. Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 564, 112 L.Ed. 2d 755 (1991).

> [T]he elements of a claim under § 523(a)(2)(A) are: the debtor made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement.

Fuller v. Johannessen (In re Johannessen), 76 F. 3d 347, 350 (11th Cir. 1996).[2] If the plaintiff fails to prove any of the elements of the claim:

> [t]he debt is dischargeable. Moreover, courts generally construe the statutory exceptions to discharge in bankruptcy "liberally in favor of the debtor," and recognize that "'[t]he reasons for denying a discharge...must be real and substantial, not merely technical and conjectural.'" In re Tully, 818 F.2d 106, 110 (1st Cir. 1987) (quoting Dilworth v. Boothe, 69 F.2d

---

[2] In Husky Int'l Elecs., Inc. v. Ritz, __ U.S. __, 136 S.Ct. 1581, 194 L.Ed. 2d 655 (2016), the Supreme Court held that "actual fraud" as used in section 523(a)(2)(A) encompasses forms of fraud that can be effected without a false representation. However, since the Trust does not assert actual fraud in this case, this distinction is not relevant to this case.

> 621, 624 (5th Cir. 1934)) see also, Boyle v. Abilene Lumber, Inc. (Matter of Boyle), 819 F.2d 583, 588 (5th Cir. 1987). This narrow construction ensures that the "honest but unfortunate debtor" is afforded a fresh start. Birmingham Trust Nat'l Bank v. Case, 755 F.2d 1474, 1477 (11th Cir. 1985).

Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994).

In its closing arguments, the Trust makes several arguments as to why its claim is nondischargeable under § 523(a)(2)(A). First, the Trust contends that Hilsman failed to disclose to Oman the financial difficulties that he and Pilot were experiencing at the time the construction contract was signed. The Trust asserts that it had a right to be informed about their financial problems. In Schweig v. Hunter (In re Hunter), 780 F.2d 1577 (1986), the Eleventh Circuit addressed the issue of whether a debtor's failure to disclose his unstable financial condition when seeking a loan was sufficient to support a claim under section 523(a)(2)(A) when the creditor had never asked for the information. The court held:

> In spite of Schweig's protestations to the contrary, Davison-Paxon Co. v. Caldwell, 115 F.2d 189 (5th Cir. 1941), cert. denied 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), remains the law of this circuit on failure to disclose and states that "not making full disclosure...is not within the exception." The court was clear that there must be actual overt false pretense or representation to come within the exception. The absence of explicit representations concerning financial conditions by the bankrupt requires a holding that there have been no false pretenses or false representations. Id.
>
> The Bankruptcy Court correctly noted that:
>
>> ...Bankruptcy law does not mandate that a debtor voluntarily disclose, without solicitation by a creditor, his personal habits, tendencies, welfare and life style, such as marital and family related problems, alcoholism, compulsive gambling and current state of

7

> physical and mental health, all of which may affect, directly and indirectly, the debtor's ability to satisfy his debts and obligations to disclose such matters to Schweig, unless Schweig requested information of this nature.
>
> . . . . .
>
> To require such a myriad of unbounded unsolicited disclosures by a debtor can only lead to confusion in the minds of debtors as to the information which he may be required to reveal to a creditor.

Id. at 1580.

In this case, there was no evidence that Oman asked about Hilsman's or Pilot's financial condition or that Hilsman voluntarily provided any financial information that was false. Accordingly, the failure of Hilsman to disclose information on his or Pilot's financial condition does not support a claim under section 523(a)(2)(A).[3]

---

[3] The cases cited by the Trust do not support its position in this case. In New Jersey Lawyers' Fund for Client Prot. v. Trombadore (In re Trombadore), 201 B.R. 710 (D. N.J. 1996), aff'd 129 F. 3d 1256 (3rd Cir. 1997) (table), the court held that the failure to disclose one's financial condition when seeking a loan would not, by itself, support a nondischargeable claim. Id. at 715. Rather, bad faith or an intent not to repay the loan must be proven. Id. There was no evidence introduced at trial in this case to prove bad faith and, as explained hereafter, the Trust failed to establish an intent not to complete the contract.

The case of FCC Nat'l Bank v. Gilmore (In re Gilmore), 221 B.R. 864 (Bankr. N.D. Ala. 1998), addressed the issue of whether the user of a credit card makes an implied representation of her intent to repay the debt each time she used her credit card. The court analyzed the pre-Code case of First Nat'l Bank of Mobile v. Roddenberry (In re Roddenberry), 701 F.2d 927 (11th Cir. 1983) where the court:

> [h]eld that regardless of a debtor's intent to repay, or lack thereof, debts incurred by a debtor's use of credit cards prior to revocation of the debtor's charging privileges are dischargeable.

The Trust further argues that Hilsman made misrepresentations (1) about how money paid by the Trust would be used; (2) that the house would be completed by February 2, 2015, if certain payments were made in December 2014; and (3) that the house would be finished by June 15, 2015 if a final payment was made in April 2015. All of these contentions relate to Pilot's alleged promise to do an act in the future. As the First Circuit Court of Appeals explained:

> [T]he concept of misrepresentation includes a false representation as to one's intention, such as a promise to act. 'A representation of the maker's own intention to do...a particular thing is fraudulent if he does not have the intention' at the time he makes the representation. Restatement (Second) of Torts § 530(1); see Anastas v. American Sav. Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir. 1996). 'The state of a man's mind is as much a fact as the state of his digestion.' Restatement (Second) of Torts § 530 cmt. a. Likewise, 'a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit.' W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 109, at 763 (5th ed. 1984) (footnotes omitted); see Restatement (Second) of Torts § 530(1) cmt. c. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. Restatement (Second) of Torts at § 530 cmts. b, d. This is true 'even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed

---

Id. at 870. The court held that Roddenberry was still good law under the Bankruptcy Code. Obviously, this is not a credit card case.

Finally, the case of Duncan v. Bucciarelli (In re Bucciarelli), 429 B.R. 372 (Bankr. N.D. Ga. 2010) did not involve a situation where the debtor failed to disclose information about her financial condition. Rather, it involved a situation in which it was proven at trial that the debtor never intended to pay her attorneys when she promised to pay them if they would represent her in her divorce case.

9

> intentions.' 4 Collier on Bankruptcy ¶ 523.08[1][d], at 523-43.
>
> The test may be stated as follows. If, at the time he made his promise, the debtor did not *intend to perform*, then he made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made. See, e.g., In re Anastas, 94 F.3d at 1285; Milwaukee Auction Galleries Ltd. v. Chalk, 13 F.3d 1107, 1109 (7th Cir. 1994) (more than mere nonperformance of a contract was necessary to establish misrepresentation); Melon Bank Corp. v. First Union Real Estate, 951 F.2d 1399, 1410-11 (3rd Cir. 1991) (same); Craft v. Metromedia, 766 F.2d 1205, 1219, 1221 (8th Cir. 1985).

Palmacci v. Umpierrez, 121 F.3d 781, 786-87 (1st Cir. 1997). With these principles in mind, the Court will address each of the alleged misrepresentations.

The Trust alleges that Hilsman made a false representation about how payments by the Trust would be applied. The Trust argues that the contract, specifically the "Draw Schedule" attached to the contract as Exhibit B, controlled how payments were to be applied. The Trust further alleges that each time Hilsman made a draw request, he made a false representation that the money would be applied only to the Trust house, when in fact the money was placed in Pilot's general operating account and applied to other bills of Pilot.

Hilsman admitted that all payments received on all of Pilot's jobs, including the payments by the Trust, were deposited into Pilot's general operating account, which was Pilot's sole bank account. He also testified that he and his bookkeeper would routinely review Pilot's bills and that he would decide which bills were to be paid. Generally, this would be the oldest bills, but sometimes it would be to the vendors making the most

10

demands. Therefore, Hilsman admitted that payments from the Trust were not applied solely to the Trust house. However, arguing that this establishes a false representation misconstrues the contract.

Paragraph 8.A.2. of the contract contains the only provision in the contract that provides an option requiring that payments be held in trust and applied to the costs of the Trust house only. The contract provided for selection of this option by "checking" the paragraph. However, this paragraph only applies to the initial "Earnest Money" deposit and it was not "checked" to be included in the contract.[4] There is no other provision in the contract that required Pilot to apply the Trust payments solely to the Trust house costs. While the Draw Schedule does allocate the contract price among the various stages of construction of the house, there is no language in the Draw Schedule that required Pilot to use each draw request solely to pay the costs of the Trust house.

In summary, there was no evidence that Hilsman promised that Trust payments would be used solely for the costs of the Trust house. The contract does not contain any such promise. Accordingly, Pilot's use of Trust payments to pay other bills of Pilot did not constitute a false representation.

Next, the Trust argues that Hilsman made a false representation when he promised the house would be completed by February 2, 2015, if the Trust, in December 2014, would make a $34,250 draw payment and a $26,452 payment for extras ordered by the Trust. The Trust argues that, because Hilsman knew Pilot was using the payments to pay bills unrelated

---

[4] At trial, neither party addressed this paragraph. Therefore, there was no evidence as to whether the failure to select this paragraph was intentional or by oversight.

11

to the costs of the Trust house, he had to know that Pilot would be unable to complete the house by February 2015.

The testimony on the promise to complete the house by February 2, 2015, was in conflict. Oman testified that at a meeting with Hilsman on December 8, 2014, Hilsman promised the house would be finished by February 2, 2015, if the requested payments were made. Hilsman testified that he did tell Oman that he expected the house could be completed by February, but that it was never promised or guaranteed because problems with weather were causing delays on the house that was "piggybacked" with the Trust house and subcontractors were getting very busy, thus causing Pilot to have to wait for them to be available.

Assuming, without deciding, that the February date was a guaranteed date, it was the Trust's burden to prove that at the time this promise was made, Hilsman either knew that he could not perform, or had no intention to perform. However, Hilsman testified that in December 2014, construction on the Trust house was proceeding, that Pilot had several other projects ongoing and that the failure to complete the house by February 2015 was not related to financial problems, but was due to unexpected delays with getting subcontractors. He further testified that he had always intended to complete the Trust house. He testified that it was not until late spring, 2015, when several projects were cancelled unexpectedly, that he realized that Pilot would be unable to complete the house. There was no evidence to challenge this explanation. Accordingly, the Court finds that the Trust has failed to carry its burden.

The Trust also argues that Hilsman made a false representation in May 2015, when

12

he promised that the house would be completed by June 15, 2015 if the final draw for $34,250 was paid.[5] The Trust argues that Hilsman had to have known that this representation was false because, at this time, Pilot's checking account was overdrawn and that Pilot was borrowing $50,000 from a third party. However, Hilsman testified that work was performed on the house after this last payment and that he was expecting other money from other projects to come in. In fact, the bank statements for Pilot's checking account show that, after the final draw was paid by the Trust, an additional $150,713 was deposited into the account from other sources. Again, Hilsman testified that he intended and expected to be able to complete the house until several projects were cancelled unexpectedly. Based on this evidence, the Court finds that the Trust has failed to establish that Hilsman knew that he could not perform the promise to complete the house by June 15, 2015.

Finally, the Trust argues that this Court should apply O.C.G.A. § 16-8-15 and find that the Trust has made a prima facie case of intent to defraud. That statute provides, in pertinent part:

> (a) Any...contractor...who with intent to defraud shall use the proceeds of any payment made to him on account of improving certain real property for any other purpose than to pay for labor or service performed on or materials furnished by his order for this specific improvement while any amount for which he may be or become liable for such labor, services, or materials remains unpaid commits a felony...
>
> (b) A failure to pay for material or labor furnished for such property improvements shall be prima facie evidence of intent to defraud.

Section 16-8-15 is a criminal statute. At trial, counsel for the Trust acknowledged

---

[5] Although this amount does not match the final draw listed in the Draw Schedule, the difference was not explained.

that Hilsman has not been convicted under this statute. A conviction under this statute requires proof beyond a reasonable doubt (O.C.G.A. § 16-1-5), whereas the burden of proof in a dischargeability case is only preponderance of the evidence. Grogan, supra. Because of the difference in the burden of proof, the Court does not believe that a criminal statute should apply in a dischargeability case, unless there has been a prior conviction.

Further,

> [s]ubsection (b) of the statute provides that '[a] failure to pay for material or labor furnished for such property improvements shall be prima facie evidence of intent to defraud.' But the presumption created by the statute is a permissive presumption, not a conclusive one. '[T]he duty still devolved upon the state to prove every element of the crime charged beyond a reasonable doubt,' including the specific intent to defraud. (citations omitted).

Thompson v. State, 233 Ga. App. 792, 793, 505 S.E.2d 535, 536 (1998).

The parties stipulated that the Trust had paid over $420,000 to Pilot and that $256,000 had been applied to labor and materials for the house, thus leaving a claim of $164,000.[6] However, there was no evidence that there was $164,000 of unpaid labor and materials which had actually been furnished. Rather, Oman testified that he discovered that unpaid vendors totaled approximately $60,000 only. Nevertheless, as explained above, until the unexpected cancellation of several projects, Hilsman thought he would be able to complete the house. Accordingly, there was no proof that he had an intent to defraud.

In summary, the Court finds that the Trust has failed to prove its claim under 11 U.S.C. § 523(a)(2)(A).

---

[6] See footnote 1, supra.

2. <u>Piercing the Corporate Veil</u>

The Trust has a claim against Pilot for $164,000 arising from Pilot's failure to fully perform under the construction contract between the Trust and Pilot. Hilsman was not a party to the contract, did not personally guarantee Pilot's performance, and had no direct personal liability to the Trust. Thus, even if the Trust had successfully proven a false representation by Hilsman, the Trust would then have to show that Hilsman was personally liable for the debt of Pilot to the Trust. To do this, the Trust argues that Pilot was the alter ego of Hilsman and that Pilot's corporate veil should be pierced so that Hilsman is personally liable for Pilot's debt to the Trust.[7]

> The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or to evade contractual or tort responsibility. Because the cardinal rule of corporate law

---

[7] This Court has recognized that numerous courts have imposed liability on "...an individual debtor who acted as agent of the artificial entity and who personally committed the tortious acts complained of." <u>Fennell v. Donnan (In re Donnan)</u>, 2013 WL 3992411, at 6 (Bankr. M.D. Ga. Aug.1, 2013), <u>aff'd</u> 2014 WL 231964 (M.D. Ga. Jan. 21, 2014). However, since this theory of liability was not argued by the Trust, it will not be considered. See <u>e.g.</u>, <u>Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.</u>, 927 F.2d 1198, 1199 (11th Cir. 1991) ("An argument not made [at trial] is waived...").

For the same reason, the Trust has waived any argument that the contract was a direct contract between the Trust and Hilsman. At trial, the Trust solicited testimony that the signature line in the contract for the "Builder" is signed by Hilsman, without any indication of his corporate position. However, the Trust did not pursue this argument in its closing arguments. In any event, "It is a well settled rule that where the language in an instrument is ambiguous, parol evidence is admissible to explain the capacity in which one signed the agreement." <u>Dundon v. Forehand</u>, 152 Ga. App. 749, 750, 263 S.E.2d 687, 688 (1979). Here, the opening paragraph of the contract defines "Builder" as "Pilot Builders, Inc." Under the signature line on the signature page, the corporate name is shown and Hilsman is shown as the CEO. Further, Oman acknowledged that all payments made by the Trust were to Pilot Builders. Based on the evidence produced at trial, it is clear that Hilsman intended to sign in his corporate capacity and that Pilot is the party to the contract.

15

> is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders, the mere operation of corporate business does not render one personally liable for corporate acts. Sole ownership of a corporation by one person or another corporation is not a factor, and neither is the fact that the sole owner uses and controls it to promote his ends. There must be evidence of abuse of the corporate form. [The] [p]laintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control. (citations omitted).

J-Mart Jewelry Outlets, Inc. v. Standard Design, 218 Ga. App. 459, 460, 462 S.E. 2d 406, 407 (1995).

> [C]ourts are reluctant to disregard the separate existence of related corporations by piercing the corporate veil, and have consistently given substantial weight to the presumption of separateness. The corporate entity may be disregarded only in exceptional circumstances.

McKesson Corp. v. Green, 266 Ga. App. 157, 166, 597 S.E. 2d 447, 455 (2004), aff'd 279 Ga. 95, 610 S.E. 2d 54 (2005) (quoting McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc., 339 F.3d 1087, 1094 (9th Cir. 2003)).

> Courts typically look at whether the principals commingled the assets of the company with their personal assets or otherwise confused the assets, records and the liabilities of the individual and the corporation. Piercing the corporate veil, or finding that a company is the alter ego of an individual, is justified where the owner treats the company and himself as one unit, or where the owner uses corporate funds for personal expenses. (citations omitted)

Moyer v. Geer (In re Geer), 522 B.R. 365, 392 (Bankr. N.D. Ga. 2014).

In this case, there is no evidence that Hilsman abused the corporate form. Pilot had its own bank account. Its funds were not commingled with Hilsman's. All corporate income was deposited into Pilot's bank account and all corporate expenses were paid from this account. While Hilsman had personally guaranteed some of this debt, Hilsman never used corporate funds to pay his separate personal expenses. The corporation had a separate

16

office, filed separate tax returns, maintained licenses and insurance in its own name and, until it was dissolved, maintained its registration with the Secretary of State of Georgia.

The Trust argues that Hilsman failed to hold annual corporate meetings. While this was not disputed, the Trust has not cited, and this Court has been unable to find, any case where the failure of the sole officer, shareholder and director of a corporation to hold annual meetings was the sole or primary basis for piercing the corporate veil.

The Trust argues that Hilsman does not know where the corporate records are located. However, Pilot was dissolved in October 2015. Hilsman testified that he had the records and he thought the records were in storage somewhere. The Court fails to see why Hilsman's failure to remember the exact location of records of a corporation dissolved over one and one-half years ago would constitute an abuse of the corporate form and justify piercing the corporate veil.

The Trust also argues that no corporate resolution was passed to authorize the corporation to borrow money ($50,000) in May 2015 and repay the loan by automatic deductions from its checking account. However, a Georgia corporation is given broad powers "...to do all things necessary or convenient to carry out its business and affairs...", including the power to use its personal property, enter into contracts and to borrow money, "[u]nless its articles of incorporation provide otherwise...". O.C.G.A. § 14-2-302(4) and (7). The Trust introduced no evidence that the articles of incorporation of Pilot required resolutions to engage in these activities.

The Trust focuses on the fact that Hilsman could not remember why he had written, on the corporate bank account, a check to himself for $29,000 in 2014 and a check to his

stepmother for $10,000 in May 2015. However, given the number of checks reflected on the corporate bank statements[8], it is not surprising that Hilsman would not remember specific transactions which occurred two or more years ago. Furthermore, the Trust failed to show that these checks were in some way improper.

The Trust points to the fact that Hilsman is personally liable for almost all of the debt of Pilot. However, it is not unusual for vendors and lenders to require the owner of a small corporation to personally guarantee the corporation's debts.

The Trust also focuses on the fact that Hilsman, in his bankruptcy schedules of assets and liabilities, listed the deposits in Pilot's checking account and Pilot's office furniture as his personal property. Hilsman testified that his attorney prepared the schedules and that he, Hilsman, did not understand the legal significance of listing those assets as his personal property. The failure to distinguish in the bankruptcy schedules between Hilsman's property and the corporation's property does not provide a basis for piercing the corporate veil.

The Trust asserts that Hilsman used money from his personal bank account to pay certain bills owed by Pilot. Hilsman testified that he was trying to keep the corporation going. It is not unusual for the owner of a small corporation to use his personal funds to help his company during difficult times.

The Trust points out that Hilsman listed in his bankruptcy schedules some $669,000 in unsecured debt, most of which was Pilot's business debt. Hilsman testified that some of

---

[8] The corporate bank statements introduced at trial show more than 2,200 checks passed through Pilot's account from September 2013 through September 2015.

Pilot's creditors were "coming after him." Hilsman personally guaranteed much of this debt. Regardless of whether he was personally liable for the debts, listing these creditors so that they would receive notice of his bankruptcy filing and the automatic stay was not an abuse of the corporate form, but rather an effective strategy for dealing with those creditors.

Finally, the Trust argues that Hilsman had complete control over which debts of Pilot were paid and which construction projects were completed. Since he was the sole shareholder, officer and director, it is not surprising that he made the final decisions with respect to corporate actions. The fact that he made these decisions to "promote his ends" is not a basis for piercing the corporate veil. J-Mart Jewelry Outlets, Inc., supra.

In summary, the Court has considered each of the Trust's arguments, both individually and collectively. The Trust has failed to establish that Hilsman abused the corporate form of Pilot. Accordingly, it has failed to carry its burden to show that the Court should pierce the corporate veil of Pilot and hold Hilsman personally liable for the Trust's claim.

3. Conclusion

Based on the findings and conclusions set forth above, the Court finds that the Trust has failed to carry its burden under 11 U.S.C. § 523(a)(2)(A). Accordingly, the relief requested by the Trust in its complaint is denied and the same is hereby dismissed, with prejudice. A separate order consistent with this opinion will be entered.

*END OF DOCUMENT*